UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAUL ECCLESTON JACKSON,

Petitioner,

v.

ATTORNEY GENERAL OF THE
UNITED STATES,

Respondent.

Civil Action No. 18-26 (JEB)

## MEMORANDUM OPINION

This immigration and citizenship controversy hinges on one very simple question: who is Petitioner Paul Jackson's biological father? Would that the answer were so easily found. Three years ago, the Board of Immigration Appeals ordered the Jamaican-born Jackson's removal from this county. He petitioned a federal appellate court for judicial review of that order, maintaining that he could not be deported because he is a U.S. citizen. More specifically, Petitioner alleged that he acquired citizenship via his putative American father — Herbert Jackson. The appellate court found that there were genuine issues of material facts as to Paul's citizenship status, and the case has made its way here for *de novo* consideration of that issue.

Following about a year and a half of discovery, he now moves for summary judgment on his citizenship claim or, in the alternative, for partial summary judgment on several elements of that claim. In rejoinder, the Government chiefly contends that the identity of Petitioner's natural father remains in dispute. Having combed through the record, the Court concludes that Paul has satisfied all but one part of his claim — that is, biological paternity. For that reason, it will grant only partial summary judgment and require a trial to finally determine Petitioner's true lineage.

1

I.      **Background**

To set the stage, the Court begins by laying out the uncontested facts bearing on Petitioner's progenitors before turning to those in dispute. It will then offer a few words on this case's procedural history.

   A.   Factual History

Upon multiple facts do the parties agree. In October 1967, Eupheme Finlayson gave birth to Petitioner in Kingston, Jamaica. See ECF No. 25 (Appendix Volume II) at RESP624–25. She filled out a "Birth Registration Form" by hand, leaving blank the lines designated for the names of the child and the father. Id. at RESP624. Later that month, she amended the form and named the child "Paul Eccleston Matthews." Id. She did not, however, enter a name for the child's father. Id.

After a few months passed, in March 1968, she filed a summons in her country, seeking child support for the newborn and other relief from a Jamaican man named Fahrin Matthews. Id. at RESP106. That summons was dismissed for lack of jurisdiction. Id. at RESP102–12. Before the end of the year, in November 1968, Eupheme came to the U.S. as a legal permanent resident, leaving her infant son with her relatives in Jamaica. Id. at RESP21–22, 27–28; see ECF No. 26 (Appendix Volume III) (Deposition of Paul Jackson) at 34–37.

Within three years of arriving in this country, in 1971, Eupheme married Herbert Jackson — an American citizen — in Maryland. See Vol. II at RESP12, 16; ECF No. 24 (Appendix Volume I) at PET1. Two years later, the couple moved to Jamaica. See ECF No. 31-2 (Resp. Statement of Facts) at 17, ¶ 37; Vol. II at RESP14; Vol. I at PET36. Upon returning to the island, Eupheme legally changed her son's surname from "Matthews" to "Jackson." See Vol. II at RESP708–13.

For a number of years, the Jacksons resided in Jamaica, but they eventually made their way back to Maryland. See Resp. SMF at 17–18, ¶¶ 39–40. Herbert and Eupheme returned first, see Vol. I at PET36 (Herbert returned in 1979); Vol II at RESP2 (Eupheme returned in 1980), and in 1981, Paul joined them, entering this country as a legal permanent resident. Id. at RESP613–17. With the assistance of a relative, he filled out his immigration paperwork and identified Herbert as his father. Id. Further, an application for a social-security number the following year stated the same thing. See Vol. I at PET49.

The path now turns more crooked. Because Herbert passed away decades ago, the foolproof method of determining whether he is Paul's birth father — i.e., a DNA test — is not available. See Vol. I at PET239 (Herbert died in 1992); see also id. at PET237–38 (Eupheme died in 1986). That being so, Petitioner must rely on a variety of circumstantial evidence — all of which the Government contests — to make his case. For example, he points to the deposition testimony of a family friend who alleged that Herbert and Eupheme were in a romantic relationship before she gave birth to Paul. See Vol. III (Deposition of Clive Gifford) at 8, 27–29. As evidence, this witness testified that, on several occasions, Herbert visited Eupheme in Jamaica while she was pregnant with Petitioner. Id. at 22–26. During those visits, the two allegedly were physically affectionate with one another. Id. at 22 (stating that he saw them "hug" and "kiss").

The Government, however, maintains that this testimony is wholly unreliable, riddled with inconsistencies, and directly contradicted by other witness accounts. See Resp. SMF at 11, ¶ 22. Those people aver that Herbert met Eupheme long after Paul had been born. See Resp. Opp. at 5; Vol. III (Deposition of Leonard Jackson) at 23 (stating his belief that the two met in the United States — i.e., sometime after November 1968). More telling still, the Government

3

points out that Herbert could not legally travel to Jamaica until 1973 — when he first applied for a U.S. passport. See Resp. SMF at 11, ¶ 22; Vol. I at PET172–73. As such, Herbert and Eupheme could not have been together at the time of Paul's conception. The Government posits, in short, that the timelines simply do not add up.

B. Procedural History

Since the late 1980s, Petitioner has had multiple encounters with law enforcement that have landed him in prison and subject to removal. See Vol. II at RESP72–83 (chronicling drug and illegal-reentry offenses). Indeed, he has been deported to Jamaica several times. Id. at RESP74 (listing deportations in 1993, 1996, and 2009). As a result of his latest criminal episode in 2012, an immigration judge once again ordered Paul's removal from this country following the completion of his prison sentence. See Jackson v. Att'y Gen., 3d Cir. No. 17-1318, Doc. 3112588204. After serving out his sentence, Paul moved to reopen this removal decision, but an IJ denied his request. See Jackson v. Att'y Gen., 663 F. App'x 245, 246 (3d Cir. 2016). The case then wound its way through the administrative-appeals process, culminating with the Board of Immigration Appeals' affirming that order in January 2017. See Jackson, Doc. 3112588204.

Undeterred, Paul sought review before the Third Circuit pursuant to 8 U.S.C. § 1252(b). Id.; see also id. (noting that he was then detained by immigration authorities in Pennsylvania). That statute permits a would-be deportee to challenge his removal order on the basis that he is a U.S. citizen and therefore not subject to deportation. See Ricketts v. Att'y Gen., 897 F.3d 491, 492 (3d Cir. 2018) (citing 8 U.S.C. § 1252(b)(5)). Petitioner argued that he could not be deported because his alleged biological father (Herbert) was an American citizen, which makes him one, too.

The Third Circuit identified a genuine issue of fact underlying his acquired-citizenship claim. See Jackson, Doc. 3112808615. It therefore transferred the proceeding to a federal district court in Pennsylvania for a *de novo* hearing. Id. (invoking 8 U.S.C. § 1252(b)(5)(B)). That court, in turn, transferred the case here when Paul moved to the District of Columbia. See Docket Entry Jan. 9, 2018.

With discovery having concluded, Petitioner has filed a Motion for Summary Judgment on his citizenship claim. In the alternative, he moves for partial summary judgment on several elements of that claim. Briefing is now complete, and the Court is ready to rule on the Motion.

## II.    Legal Standard

Upon a party's motion, Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it can affect the substantive outcome of the litigation. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)); see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006) (same). Courts, moreover, must apply the same evidentiary standard of proof that would apply at trial. See Liberty Lobby, 477 U.S. at 254 (holding that "the judge must view the evidence presented through the prism of the substantive evidentiary burden."). They, however, must "eschew making credibility

determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

To defeat summary judgment, an opposition must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). The non-movant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. U.S. Navy, 813 F.2d 1236, 1243–44 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249–50.

**III.   Analysis**

The legal principles that govern citizenship claims are well established. Time and again, the Supreme Court has made clear that there are only "two sources of citizenship": birth and naturalization. Miller v. Albright, 523 U.S. 420, 423 (1998) (quoting United States v. Wong Kim Ark, 169 U.S. 649, 702 (1898)). As to the first category, the Constitution expressly grants U.S. citizenship to all persons born in this country. See U.S. Const. amend. XIV, § 1. Those born abroad, on the other hand, "acquire citizenship by birth only as provided by Acts of Congress." Miller, 523 U.S. at 424 (citing Wong Kim, 169 U.S. at 703).

Paul maintains that, though he was born on Jamaican soil, he became an American citizen by virtue of his biological father's citizenship and subsequent legitimation. In evaluating his claim, the Court must look to the law in effect at the time of Petitioner's birth in 1967. See Sessions v. Morales-Santana, 137 S. Ct. 1678, 1687 n.2 (2017). At such time, Congress provided for a blanket grant of citizenship to those children born abroad who had at least one U.S. citizen parent, subject only to that parent's meeting a physical-presence requirement in this

country.  See 8 U.S.C. § 1401(a)(7) (1964 ed.).  Under that criterion, the citizen parent must have been present in the U.S. for ten years prior to the child's birth, and at least five of those years had to follow the parent's 14th birthday.  Id.

The legislature, moreover, imposed an additional requirement on a "child born out of wedlock" to a citizen father.  See 8 U.S.C. § 1409(a) (1964).  Namely, before that child turned 21 years old, his father's paternity must have been established by legitimation (under the law of either the father's or the child's domicile).  Id.; id. § 1101(c)(1) (1964); Tineo v. Att'y Gen., 937 F.3d 200, 204 (3d Cir. 2019).

Putting all this together, to succeed on his citizenship claim, Petitioner must prove that: (1) Herbert is his biological father; (2) Herbert was a U.S. citizen when Paul was born; (3) before Paul's birth, Herbert had been physically present in the U.S. for at least ten years, at least five of which were after he turned 14; and (4) prior to Paul's turning 21, Herbert legitimated him as his son under Jamaican or Maryland law.

Of these elements, the Government has effectively conceded the last three by wholly failing to challenge the sufficiency of Petitioner's evidence, which is, in any event, solid on all three.  See ECF No. 31 (Resp. Opp.) at 23–24.  In Respondent's view, it is unnecessary to reach these elements because the first one — biological paternity — has not been established.  Id.  The Court disagrees.  Even assuming for a moment that Paul has not shown that Herbert was his birth father, partial summary judgment on the undisputed components of his claim would still be appropriate.  See Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment (recognizing that partial summary judgment could be sought "as to a claim . . . or part of a claim") (emphasis added); see also Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund, 778 F.3d 593, 606 (7th Cir. 2015) ("[P]atrial summary judgment can serve a useful brush-clearing

function even if it does not obviate the need for a trial . . . ."). For these reasons, the Court finds that Paul has surmounted the summary-judgment hurdle as to the last three elements. All that remains to analyze, then, is whether he has satisfied the first element.

   A.   Requisite Burden

To decide whether Herbert is Petitioner's natural father, the Court must first address a threshold issue — *viz.*, exactly how much proof must Paul adduce to shoulder his burden? The parties vigorously disagree on this, each offering a different approach for the relevant burden and quantum of proof.

For starters, Petitioner urges this Court to adopt the Ninth Circuit's three-part burden-shifting framework. See ECF No. 27-3 (MSJ) at 3–7. Under that approach, the government bears the initial burden to prove non-citizenship. Mondaca-Vega v. Lynch, 808 F.3d 413, 419 (9th Cir. 2015) (*en banc*). It can do so, for example, by pointing to a petitioner's admission that he was born abroad. See, e.g., Corona-Palomera v. INS, 661 F.2d 814, 818 (9th Cir. 1981). This creates a rebuttable presumption of non-citizenship. Id.

At that point, the burden shift backs to the petitioner, who must present "substantial credible evidence" of citizenship to "burst" the non-citizenship presumption. Mondaca-Vega, 808 F.3d at 419. (For those unfamiliar with this standard, "[s]ubstantial evidence is more than a scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Rivera v. Mukasey, 508 F.3d 1271, 1274 (9th Cir. 2007) (quoting Turcios v. INS, 821 F.2d 1396, 1398 (9th Cir. 1987)); see also Rose v. Sessions, 679 F. App'x 557, 559 (9th Cir. 2017) ("Substantial evidence is 'more than mere scintilla,' . . . but less than a preponderance.") (omission in original) (quoting Saelee v. Charter, 94 F.3d 520, 522 (9th Cir. 1966)).)

If a petitioner meets this burden, the government must then counter with "clear and convincing evidence" of non-citizenship. Mondaca-Vega, 808 F.3d at 419; see also United States v. Montague, 40 F.3d 1251, 1255 (D.C. Cir. 1994) (noting that "clear-and-convincing standard" requires factfinder "to reach a firm conviction of truth on the evidence about which he or she is certain").

For its part, the Government rejects this scheme altogether. See Resp. Opp. at 12–14. It maintains that, in proceedings brought under § 1252(b)(5)(B), the onus falls squarely on the petitioner to prove his citizenship claim by a preponderance of the evidence. Id. at 15. It finds support for this position in the provision's text — chiefly, the requirement that district courts are to make "a decision on [a citizenship] claim as if an action had been brought . . . under [the Declaratory Judgment Act, 28 U.S.C. § 2201]." See Resp. Opp. at 10 (quoting 8 U.S.C. § 1252(b)(5)(B)). Because individuals seeking declaratory judgments of citizenship must meet a preponderance standard, the argument goes, a petitioner claiming citizenship in a § 1252(b)(5)(B) proceeding must meet the same burden. Id. at 10–11, 13. The Government is not alone in its thinking; a number of appellate courts have set the bar at a preponderance of the evidence. See, e.g., Espichan v. Att'y Gen., 945 F.3d 794, 801 (3d Cir. 2019); Kamara v. Lynch, 786 F.3d 420, 425 (5th Cir. 2015); Leal Santos v. Mukasey, 516 F.3d 1, 3–4 (1st Cir. 2008).

Fortunately, the Court, at this point, need not decide who has the better of this dispute. Even if Petitioner has met the substantial-evidence standard, he does not prevail on his Motion for Summary Judgment. That is because, as will become plain shortly, a factfinder could reasonably determine that the Government has countered with clear and convincing evidence that Herbert is not his birth father.

B.  Merits

According to the Government, the record shows that Paul's biological father is likely Fahrin Matthews — not Herbert.  See Resp. Opp. at 16–18.  To start, it looks to the events surrounding Petitioner's birth.  Recall that weeks after her son was born, Eupheme amended his birth certificate, entering "Matthews" as the child's surname.  See Vol. II at RESP624.  Shortly thereafter, Eupheme sued Fahrin for custody and child support.  Id. at RESP102–12.  Naturally, a factfinder could conclude that Eupheme would have taken these actions only if she had believed that Fahrin, not Herbert, was Paul's birth father.

Additional record evidence shows that, for several decades, Petitioner held the same belief.  He has represented as much to multiple probation officers.  See, e.g., Vol. I at PET182 (1988 Presentence Report) (identifying Fahrin as father); Vol. II at RESP65 (1999 PSR) ("The defendant stated that he is the only child born from a relationship between Farim [sic] Matthews and Eupheme Jackson (nee: Finlayson)."); id. (referring to Fahrin as his "natural father"); id. at RESP80 (2012 PSR) ("Paul Eccleston Jackson was born to Farim [sic] Matthews and Eupheme Finlayson . . . .").  In those same reports, he made clear that he did not believe that Herbert is his birth father.  See, e.g., 1999 PSR at RESP65 (referring to Herbert as his "stepfather" several times); 2012 PSR at RESP80 ("Ms. Finlayson married Herbert Jackson when defendant was four or five years old; and it is [Herbert] who the defendant refers to as his father.  The defendant indicated that he was adopted by [Herbert].").

Consider also the whereabouts of Herbert and Eupheme at the time of Petitioner's conception.  Eupheme was in Jamaica.  See Vol. II at RESP14 (listing Kingston as her residence from 1965–67); see also id. at RESP4 (indicating that she did not come to America until 1968 — a year after Paul's birth).  And, says the Government, Herbert did not leave the U.S. until 1973 at

10

the earliest because he did not have a passport. See Vol. I at PET172. So he necessarily could not have been with Eupheme in Jamaica when Paul was conceived, unless he managed to travel to the Caribbean without such documentation or such documentation was not required at that time.

To sum up, even under Petitioner's preferred evidentiary framework, he comes up short. That is because a factfinder could reasonably conclude that the Government has adduced clear and convincing evidence that, contrary to Paul's take on the facts, Herbert is not his biological father. Petitioner has thus not met his summary-judgment burden of showing the absence of a disputed material fact. See Celotex, 477 U.S. at 323.

## IV.   Conclusion

For these reasons, the Court will grant in part and deny in part Petitioner's Motion for Summary Judgment. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: April 20, 2020